UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE PORT AUTHORITY POLICE BENEVOLENT ASSOCIATION, INC., and KATHLEEN HOWARD, <br><br>               Plaintiffs, <br><br>     -against- <br><br> THE PORT AUTHORITY OF NEW YORK AND NEW JERSEY, SUPERINTENDENT MICHAEL FEDORKO, LIEUTENANT TIMOTHY MCGOVERN, LIEUTENANT STEVEN ADELHELM, KAREN CONNELLY, STEVEN PASICHOW, and MICHAEL NESTOR, <br><br>               Defendants. | No. 15 Civ. 3526 (AJN)(RLE) <br><br> **AMENDED COMPLAINT AND JURY DEMAND** |

      Plaintiffs The Port Authority Police Benevolent Association, Inc. ("the PAPBA") and

Kathleen Howard, by and through their attorneys, Emery Celli Brinckerhoff & Abady LLP, for

their Complaint allege as follows:

INTRODUCTION

      1.     This case challenges the Port Authority's widespread, ongoing, and

unconstitutional searches of its employees' private cell phones.

      2.     "Modern cell phones are not just another technological convenience," Chief

Justice Roberts wrote in *Riley v. California*, 134 S. Ct. 2473 (2014). "With all they contain and

all they may reveal, they hold for many Americans 'the privacies of life.' . . . The fact that

technology now allows an individual to carry such information in his hand does not make the

information any less worthy of the protection for which the Founders fought." That protection—

the freedom from unreasonable searches enshrined in the Fourth Amendment—binds law

1

enforcement and government employers alike. The Port Authority's policy of searching the cell phones of its probationary employees is an impermissible violation of this fundamental right.

3.      The Port Authority's cell phone search policy first surfaced during a criminal investigation it conducted in the fall of 2014 into an incident that took place in Hoboken, New Jersey. Responding to news accounts, the Port Authority Internal Affairs unit conducted a widespread investigation into allegations that off-duty members of the 113th Class of the Port Authority Police Department had engaged in allegedly criminal impropriety including allegations of criminal sexual assault, criminal trespass, criminal mischief, theft, and disorderly conduct.

4.      The Port Authority investigation took over a month, involved more than 100 interviews of police officers, customers and staff of the bar, local police officials, and others. As the Port Authority proclaimed in a press release on November 7, 2014, "[a]s a result [of the investigation], nine probationary police officers are being terminated, and three additional probationary police officers are suspended for 30 days without pay and will have their probationary status extended for an additional year." At the heart of this investigation was a profound incursion into the privacy of the Port Authority's probationary officers.

5.      Over and over again, in interview after interview, Port Authority investigators isolated probationary officers and demanded to review their cell phones. Intimidated by the inquisitorial nature of the investigation, deprived of representation, and fearful they would lose their jobs, the officers complied with the Port Authority directive and relinquished their cell phones to invasive searches.

6.      This civil rights action seeks damages for these searches as violations of the Fourth Amendment as incorporated by the Fourteenth Amendment under 42 U.S.C. § 1983, declaratory relief, and an injunction prohibiting such searches in the future.

## PARTIES

7.      Plaintiff the Port Authority Police Benevolent Association, Inc. ("Plaintiff" or "PAPBA") is the exclusive bargaining representative and union for all Port Authority police officers. It is a not for profit corporation organized under the law of the State of New York and is authorized to do business in the states of New York and New Jersey. Its headquarters are located at 611 Palisade Ave., Englewood Cliffs, NJ 07632. The PAPBA's mission is to render moral and material aid to its members, to strive to improve terms and conditions of employment, and to serve as the employee organization for its members. It provides legal advice to its members regarding their rights, and serves as legal counsel in suits pending on behalf of, or against, its members. The PAPBA also represents its members with regard to terms and conditions of employment, including representation during disciplinary actions and other similar internal affairs matters.

8.      At all times relevant to this action, Plaintiff Kathleen Howard was an Officer of the Port Authority of New York and New Jersey and employed to patrol LaGuardia Airport. Ms. Howard currently resides in the county of Queens in the state of New York.

9.      Defendant Port Authority of New York and New Jersey builds, operates, and maintains many of the most important transportation and trade infrastructure assets in the country. The Port Authority also owns and manages the sixteen-acre World Trade Center site. The agency raises the necessary funds for the improvement, construction or acquisition of its facilities primarily on its own credit. The Port Authority has its own police force—the Port Authority Police Department—that provides a wide array of services necessary to protect millions of people that use Port Authority facilities and services. Its capabilities range from traditional emergency services to commercial vehicle inspection, from K-9 patrol to aircraft

rescue. The Port Authority is a bi-state entity created by the joint effort of the two states and has offices throughout New York and New Jersey.

10.     At all times relevant to this complaint, Defendant Michael Fedorko was employed by the Port Authority of New York and New Jersey as the Superintendent of Police and was duly appointed and acting as an officer, servant, employee and/or agent of the State of New York and the State of New Jersey and/or of the Port Authority. At all relevant times, he was acting under color of state law. He is sued in both his individual and official capacities.

11.     At all times relevant to this complaint, Defendant Lieutenant Timothy McGovern, Defendant Karen Connelly, Defendant Steven Pasichow, and Defendant Michael Nestor were employed by the Port Authority of New York and New Jersey and were duly appointed and acting as officers, servants, employees and/or agents of the State of New York and the State of New Jersey and/or of the Port Authority. At all relevant times, they were acting under color of state law. They are sued in both their individual and official capacities. Defendants McGovern, Connelly, Pasichow, and Nestor are referred to as "the "Policy-Making Defendants."

12.     At all times relevant to this complaint, Defendant Lieutenant Steven Adelhelm was employed by the Port Authority of New York and New Jersey and was duly appointed and acting as an officer, servant, employee and/or agent of the State of New York the State of New Jersey and/or of the Port Authority. At all relevant times, he was acting under color of state law. He is sued in both his individual and official capacities.

## JURISDICTION AND VENUE

13.     This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. §§ 1983 and 1988.

14.     The jurisdiction of this Court is predicated upon 28 U.S.C. §§ 1331, and 1343(a)(3) and (4).

15.     Venue is lodged in this Court pursuant to 28 U.S.C. § 1391(b)(1) because defendant Port Authority of New York and New Jersey resides in this judicial district. *See* § 1391(c)(2) (explaining that an entity "resides" in any judicial district in which it is subject to personal jurisdiction). The Port Authority has consented to suit in any jurisdiction within New York City, pursuant to N.Y. Unconsol. Law § 7106.

**JURY DEMAND**

16.     Plaintiffs demand trial by jury in this action.

**FACTUAL ALLEGATIONS**

17.     The cell phone searches that animate this case arose in the context of an investigation into a party in Hoboken, New Jersey attended by members of the 113th Class of the Port Authority Police Department.

**The Port Authority Commences the Texas Arizona Investigation**

18.     On August 23, 2014—the day after the graduation ceremony—a number of probationary Port Authority police officers attended an off-duty party at a bar named "Texas Arizona" in Hoboken, New Jersey.[1] The probationary officers were not wearing uniforms.

19.     Even though it was not a Port Authority party, the Port Authority opened an investigation in early September into allegations made in several pejorative news stories that described events that were alleged to have taken place that night. Several stories suggested that this misconduct included criminal acts like sexually assaulting women, stealing alcohol, and destroying private property.

---

[1]        Unless there are special circumstances, all officers are "probationary" officers for their first year of service after graduating from the police academy.

20.     The Port Authority systematically began to interview witnesses concerning the alleged criminal conduct. Over the course of several weeks in September and October, the Port Authority gathered various Port Authority officers in its "Tech Center" where they were questioned about their knowledge of the events at Texas Arizona.

21.     When the PAPBA learned of the investigation, its members began meeting with officers whom the PAPBA had been told would be questioned. More than five PAPBA representatives were diverted from their normal tasks to provide guidance and legal counsel to individuals who were going to be interviewed. The PAPBA President, Paul Nunziato, spent considerable time counselling probationary officers nearly every day for about three weeks while the Port Authority and its Internal Affairs department conducted dozens of officer interviews.

22.     When possible, PAPBA representatives spent ten to fifteen minutes with each individual prior to his or her interrogation. During those meetings, the PAPBA explained to the officers that because they were in their first year of service after graduation, they were probationary employees and could be terminated for a substantially broader range of reasons than non-probationary employees.

23.     To conduct its interrogations, the Port Authority assembled groups of probationary employees at the Port Authority Tech Center in New Jersey.  The Port Authority also paid Sergeant Kevin Cottrell, who had been present at the bar, to identify those of the waiting officers whom he recognized from the bar.

24.     The Port Authority investigators, including Defendants McGovern and Adelhelm, all of whom were superior officers, played security footage from inside Texas Arizona to the assembled probationary officers and told them that the investigators already knew what happened at the bar and that they would know if the probationary officers were lying. The Port

6

Authority investigators also showed the probationary officers a second video regarding a former officer that they said had not been honest with the Port Authority and had been terminated as a result. The investigators instructed the officers to be forthcoming in the interviews.

25.     One by one, each individual probationary officer was removed from the first room, taken alone into a second room, and told to sit at a table surrounded by Port Authority investigators. In the majority of these interrogations, the Port Authority claimed to be interested in the probationary officers as witnesses for their investigation—not subjects of that investigation—and, as a result, the officers were not entitled to PAPBA representation during the interrogation.

26.     The probationary officers understood that failing to cooperate with the investigation presented a material risk that they would be terminated. The Port Authority investigators were superior officers to the individuals who were being questioned. The probationary officers had been consistently taught throughout the Port Authority's Police Academy that they were obligated to respond affirmatively to requests from superior officers.

27.     In addition, when the Port Authority investigators began to ask questions about what happened at the bar, they did not inform the probationary officers that they could refuse to answer any questions, end the questioning, or seek counsel for representation during the questioning. The Port Authority investigators did not give those questioned any Miranda warnings.

28.     The Port Authority investigators also refused to follow other procedural safeguards required by the Port Authority-PAPBA collective bargaining agreement. Rule 3 of P.D.I. 2-6, which is part of that agreement, notes that "Before any employee may be questioned

in connection with an investigation, the employee will be apprised of Rule 3, Chapter 9 of the

Port Authority Rules and Regulations." That rule states,

> All employees must cooperate in authorized investigations of any act, omission or occurrence in or upon Port Authority property, (including but not limited to misconduct, accidents, crimes and the like), provided, however that this rule shall not require any employee to give evidence against himself in connection with the investigation of an alleged act of misconduct on his part.

29.     Rule 3 in P.D.I. 2-6 also states the person being questioned "shall also be

cautioned that disciplinary proceedings may be commenced against him and that anything he

says may be used in evidence in such proceedings."

30.     On information and belief, the Port Authority investigators either did not read any

part of Rule 3 to the probationary officers or read it but immediately told the probationary

officers that they could not invoke its protection due to their probationary status.

31.     The investigators used audio recording devices to record the interrogations.

**The Port Authority Begins to Conduct Cell Phone Searches**

32.     As the interviews progressed, the Port Authority investigators began to ask the

probationary officers to see the contents of their personal cell phones. As many of the phones

were locked, the Port Authority investigators instructed the probationary employees to unlock

the phones then produce them to the investigators.

33.     The Port Authority investigators had no basis to demand to search the officers'

cell phones. They had no probable cause, reasonable suspicion, or other lawful basis to suspect

the probationary officers had undertaken any wrongdoing much less committed any of the

criminal acts alleged. Nor did they have any other justification to search of the probationary

officers' personal cell phones. And the Port Authority investigators had no warrant to look

through the contents of the phones.

8

34. The Defendants did not subpoena the provider of the "GroupMe" application, which they had an interest in searching, or the wireless carriers to get the information they sought, even though such a subpoena would have been more targeted than a search of the witnesses' cell phones. A subpoena would have been less invasive of the probationary officers' privacy.

35. The cell phones were not issued by the Port Authority. The probationary officers had been instructed to use the work radio while on duty for work communications, not their private cell phones. The Port Authority also issued an official memorandum specifically forbidding officers from using their personal phones while on the job. None of the phone or the data or voice plan was paid for by the Port Authority.

36. The request to search the probationary officers' cell phones surprised many of the officers because they did not expect the Port Authority to demand to search their private phones. The Supreme Court had just ruled, less than six months earlier, in *Riley v. California* that the police could not search arrested individuals' cell phones without a warrant.

37. In addition, the Port Authority had previously treated their telephones as private property subject to related legal restrictions on their search. For example, P.D.I. 2-6, which is part of the collective bargaining agreement between the PAPBA and the Port Authority, says that "No search of an employee's person, property or personal papers or effects may be conducted without his consent: Except that, if authorized by the Superintendent of Police, such search may be held in accordance with law." The collective bargaining agreement also provides that searches of Port Authority officers' lockers must be approved by the Superintendent of Police or the individual he designates as acting superintendent. Given that their phones were private, and not

used for Port Authority business, the probationary officers had a reasonable expectation of privacy in their phones.

38.     The rules or practices of the Port Authority gave no notice that the private cell phones of the probationary employees were subject to search by the Port Authority. The employee handbook makes no mention that private cell phones can be searched as a condition of employment. The contents of the cell phones had never been exposed while on the job and remained private. These personal phones contained private information like contacts, text messages, emails, calendar events (including doctors' appointments and other personal engagements), and photos, along with other private information.

39.     When they demanded to search the phones, the Port Authority investigators made it clear to the probationary officers that they had no choice but to comply. Like their obligation to answer other questions, the probationary officers understood that the only alternative to submission to a search was termination.

40.     This fear was warranted. In a discussion regarding whether the probationary employees could refuse to comply with the cell phone searches, Defendant Lt. McGovern told Paul Nunziato, President of the PAPBA, that "If they don't cooperate, I mean they are at-will employees . . . ."

41.     Defendant Lt. McGovern's understanding of the probationary employees' vulnerable status is well grounded. The Port Authority-PAPBA collective bargaining agreement specifically notes that officers can be disciplined for failing to cooperate in investigations. Document R to that agreement discusses interviews of officers the Port Authority has identified as "witnesses." It states, "all Police Officers are obligated to cooperate in this type of interview pursuant to the General Rules and Regulations and failure to do so is grounds for disciplinary

action against the Police Officer." This is especially true for probationary officers who have fewer protections than their non-probationary counterparts.

42.     When the PAPBA learned that the Port Authority had begun to search individual officers' cell phones. The PAPBA instructed the probationary employees that, because they would likely be terminated if they failed to comply with a request for the phones, they would have no choice but to cooperate if they hoped to retain their positions.

**Specific Examples of the Overbroad and Unjustified Searches**

43.     The Port Authority repeatedly undertook searches of the probationary officers' cell phones without warrants. The following examples are illustrative.

44.     Defendants instructed Plaintiff Kathleen Howard, a probationary employee, to come to the Port Authority Tech Center on September 23, 2014. Like all other individuals who were investigated, Ms. Howard was directed into a room where she was alone with Port Authority investigators. The investigators initially asked her whether she had been at the Texas Arizona Bar. When she acknowledged that she had, they began asking her questions about what had occurred at the bar. Unable to remember, Ms. Howard stated that she did not recall. The investigators repeatedly accused her of lying, saying, "You are lying. I don't believe what you are saying." The investigators stopped the tape that was recording the interviews, walked out of earshot and whispered to one another. They then returned to the table, turned the tape back on and asked the same questions over and over again. After nearly twenty minutes of questioning, the Port Authority investigators asked Ms. Howard if she used the GroupMe Application, a group texting program. Ms. Howard explained she did not, but that she did have the application on her phone. The investigators then ended the interview.

45.     Later that same day, the interviewers brought Ms. Howard back into the same room where she was again surrounded by superior officers. They played her video footage from the Texas Arizona party showing her sitting at the bar. They then repeated the same questions that they had asked earlier. She, again, told them that she did not recall the details they were asking about. They told her that she "better stop messing around and better tell [them] the truth."

46.     The interviewers than directed Ms. Howard to open her cell phone. She complied. They directed her to open the GroupMe application. She again complied. The interviewers then seized her phone and reviewed its contents while obscuring it from Ms. Howard's view.

47.     On information and belief, the Port Authority terminated Ms. Howard for consistently responding that she "did not recall" to questions put to her by Port Authority investigators concerning the events at the Texas Arizona bar.

48.     Probationary Officer A's phone was also searched. During the course of a previous interrogation, Port Authority investigators had discovered a scatological, comedic photo that Probationary Officer A had sent to others. During Probationary Officer A's interrogation, Port Authority investigators demanded his phone so that they could look through his other photos. Probationary Officer A told the investigators that the photo he sent was from approximately three years before he joined the Port Authority when he was working as an HVAC technician. Nonetheless, the investigators seized his phone and searched through all of his photos. On information and belief, Probationary Officer A's probationary period was extended for one year and he was suspended without pay for thirty work days because of the photos found on his phone.

49.     In another interrogation, Port Authority investigators told Probationary Officer B that if she was uncomfortable with the request to search her phone, she could talk to a PAPBA

representative. They added, however, that "as a probationary employee, you have to comply with our requests because you don't have certain rights." After speaking with the PAPBA representatives, who told her that she would likely be fired if she did not comply with their demands, Probationary Officer B surrendered her cell phone. The Port Authority investigators looked through her phone for approximately ten minutes. They took a screen shot of some of the contents of her phone and demanded Probationary Officer B send it to them.

50.     Probationary Officer C, a recent veteran of the Iraq war, was also subjected to an unlawful search of his cell phone. When Port Authority investigators demanded his phone, he asked to speak with a PAPBA representative. When Probationary Officer C reached the PAPBA representative he was clearly angry and trying to hold back tears. He explained that he had gone to war for the United States and seen his friends killed to defend the Constitution and the rights of American citizens. He was furious that, upon returning home to his country, he was being forced to turn over private property to law enforcement despite no suspicion he had committed any wrongdoing. Probationary Officer C had his probation extended for one year and was suspended without pay for thirty work days.

51.     Port Authority investigators searched Probationary Officer D's cell phone for approximately ten minutes. He was not able to see what they searched during that time. At one point, they asked if he had any personal text messages between himself and other probationary officers. When Probationary Officer D answered that he did have such messages, investigators ordered him to show them those personal messages.

52.     Probationary Officer Laura Bordonaro was instructed to give her phone to Port Authority investigators. She could not tell what they were searching as they scrolled through her

phone. She complied, however, with the investigators' demand to take a screen shot of some of the phone's contents and send it to the investigators.

53.     Probationary Officer F went into the interview fearing that she would be fired or suspended if she did not cooperate. She had heard rumors that the Port Authority would be firing people who did not cooperate fully with the investigation. When she was directed to hand over her phone, she was afraid she would lose her job if she did not comply. In total, her interrogation lasted for approximately forty-five minutes. One of the investigators searched her phone for approximately twenty minutes while another continued to ask her questions.

54.     When the Port Authority demanded that Probationary Officer Nicholas Doscher turn over his phone, he told the investigators that his text messages and group messages were not transferred when he recently bought a new phone. The investigators then instructed him to call his wireless provider to get the messages and directed him to send those messages to the investigators once he received them. Mr. Doscher found his old phone when he returned to his home and sent Defendant McGovern a screen shot of a private text message conversation.

55.     On information and belief, other probationary officers were forced to stand at attention as Port Authority investigators went through the contents of the probationary officers' personal phones.

56.     The Port Authority concluded its investigation in November 2014. The investigation included more than 100 interviews of police officers, customers and staff of the bar, local police officials and others. As the Port Authority stated in a press release on November 7, 2014, "[a]s a result [of the investigation], nine probationary police officers are being terminated, and three additional probationary police officers are suspended for thirty days without pay and will have their probationary status extended for an additional year."

57.     Out of concern for retaliation, we have not named Probationary Officers A-D and F. Their interests are represented in this suit by the PAPBA.

**The Port Authority's Cell Phone Search Policy and Consequences**

58.     The Port Authority's decision to search the probationary employees' private cell phones was made by the Policy-Making Defendants. Rule 9 of P.D.I. 2-6, which is part of the Port Authority-PAPBA collective bargaining agreement requires the Superintendent of Police to authorize all searches of an "employee's person, property or personal papers or effects." Moreover, as the cell phone searches persisted for over one month—and it was widely known they were being conducted—the Policy-Making Defendants knew about the illegal searches, either actually or constructively, and condoned their ongoing implementation.

59.     The Port Authority's cell phone searches diverted substantial time and resources from the PAPBA's other projects, goals, and mission. For example, to educate its members of their rights with regard these phone searches, the PAPBA met with individuals before they were interviewed and their phones were searched. PAPBA President, Paul Nunziato, spent approximately fourteen to sixteen hours per day for several weeks meeting with the probationary officers who were subject to the interrogations to explain their rights and field questions about the cell phone searches. The PAPBA also attended the Port Authority Tech Center while the probationary officers were being investigated. Despite being present at the Tech Center, the PAPBA officers were not permitted to be in the interrogation room with the probationary officers as they were being questioned.

60.     Members of the PAPBA went to a national conference of police unions in November in Las Vegas for the purpose of discussing the cell phone searches with other unions.

61.     Since the end of the Texas Arizona investigation, the PAPBA has continued to divert resources and time from its central mission and other goals to address cell phone search issues. The PAPBA has expended time and resources planning and funding its strategic response to the cell phone searches including the time and expense for internal meetings and external litigation conferences and costs, together with the time and expense of managing the instant suit.

62.     Additionally, the PAPBA continues to divert resources and time to educate its members about their rights with regard to cell phone searches. For example, each year the PAPBA provides training to new officers over several days as part of the Police Academy curriculum. The PAPBA is now forced to prepare and present information concerning cell phone searches to new officers at the expense of other training materials. The PAPBA has also incurred expenses to prepare memoranda to inform both probationary and permanent officers concerning the constitutionality of the Port Authority cell phone policy.

63.     Further, to confront this policy and custom of unconstitutional searches, the PAPBA will continue to provide guidance, information, and legal counsel to officers whose Fourth Amendment rights continue to be violated in this manner in the future.

64.     The PAPBA will continue to spend resources in this manner until the Port Authority ceases to conduct such illegal searches.

65.     A notice of claim is not necessary in this suit pursuant to *Hess v. Port Authority Trans-Hudson Corporation*, 513 U.S. 30 (1994) (holding that the consent to suit provisions of N.J. Stat. §§ 32:1-157, 32:1-163 and N.Y. Unconsol. Laws §§ 7107, 7107 need not be satisfied in suits brought in federal court under federal law). Regardless, a notice of claim adhering to the requirements in N.Y. Unconsol. Laws § 7108 was filed on the Port Authority on April 30, 2015 in the same manner as a process may be served.

**CAUSE OF ACTION**

42 U.S.C. § 1983 – Unreasonable Search and Seizure against all Defendants

66.     Plaintiff repeats and realleges the foregoing paragraphs as if the same were fully set forth at length herein.

67.     Port Authority investigators, including Defendants McGovern and Adelhelm, wrongfully seized and searched the probationary officers' cell phones in violation of the Fourth Amendment to the United States Constitution as applied to the Port Authority of New York and New Jersey through the Fourteenth Amendment. They are liable in both their personal and official capacities.

68.     Defendant Port Authority of New York and New Jersey had a policy or practice of conducting these searches. The Policy-Making Defendants were policy-making officials for the Port Authority and either made the decision to conduct the searches or were aware of these unconstitutional searches and allowed them to persist. They are liable in both their personal and official capacities.

69.     The individuals searched did not consent to the searches.

70.     The search and seizure of the cell phones was unaccompanied by any warrant, probable cause, or reasonable suspicion.

71.     At all relevant times, all Defendants acted under pretense and color of law. The wrongful acts were beyond the scope of Defendants' jurisdiction, without authority of law, and in abuse of power.

72.     As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages herein alleged and continues to sustain damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment against Defendants as follows:

a.   Compensatory damages in an amount to be determined;

b.   Injunctive relief enjoining the use of such searches in the future;

c.   A declaration that Defendants' policy of searching the cell phones of probationary police officers is unlawful and unconstitutional under the Fourth Amendment of the United States Constitution;

d.   Reasonable attorneys' fees and costs under 42 U.S.C. § 1988; and

e.   Such other and further relief as this Court may deem just and proper.

Dated:  New York, New York
        October 21, 2016

EMERY CELLI BRINCKERHOFF &
ABADY LLP


_____/s_____
Richard D. Emery
O. Andrew F. Wilson
Samuel Shapiro
600 Fifth Avenue, 10th Floor
New York, NY 10020
(212) 763-5000

*Attorneys for Plaintiffs*