UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X
THE PORT AUTHORITY POLICE
BENEVOLENT ASSOCIATION, INC. and
KATHLEEN HOWARD,

                            Plaintiffs,

          -against-

THE PORT AUTHORITY OF NEW YORK
AND NEW JERSEY, SUPERINTENDENT
MICHAEL FEDORKO, LIEUTENANT
TIMOTHY MCGOVERN, LIEUTENANT
STEVEN ADELHELM, KAREN CONNELLY,
STEVEN PASICHOW, and MICHAEL
NESTOR,

                            Defendants.
-------------------------------------------------------X

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/29/17

15-CV-3526 (KMW) (RLE)
**OPINION & ORDER**

KIMBA M. WOOD, United States District Judge:

Plaintiffs the Port Authority Police Benevolent Association, Inc. ("PAPBA") and

Kathleen Howard bring this 42 U.S.C. § 1983 action against Defendants The Port Authority of

New York and New Jersey ("Port Authority"), Lieutenant Steven Adelhelm, Karen Connelly,

Superintendent Michael Fedorko, Lieutenant Timothy McGovern, Michael Nestor, and Steven

Pasichow. Plaintiffs allege that Defendants violated the Fourth Amendment rights of Howard and

PAPBA's members. Defendants deny this and have now moved for summary judgment.

For the reasons stated below, the Court DENIES Defendants' Motion to the extent that

(1) a reasonable jury could find that Defendants engaged in warrantless cell phone searches that

violated the Fourth Amendment rights of Howard and PAPBA's members because

(a) Defendants' warrantless searches of personal cell phones were not protected as "work-related"

searches, and (b) a reasonable jury could find that Howard and PAPBA's members did not give

valid consents to these searches. Furthermore, it would be reasonable to find that the Port

Authority has conceded that the searches were authorized by Port Authority personnel who had "final policymaking authority" over the searches. The Court GRANTS Defendants' Motion to the extent that (1) claims against Defendants Adelhelm, Connelly, Fedorko, McGovern, Nestor, and Pasichow are dismissed because they are entitled to qualified immunity, and (2) the equitable claims against all Defendants are dismissed because Plaintiffs lack standing to bring those claims.

Trial will therefore go forward on the issue of whether Howard and PABPA's members gave valid consents to the searches. To the extent that the jurors find that the consents were not valid, it appears that the Port Authority is liable for violating the Fourth Amendment rights of Howard and PABPA's members, because it appears that Port Authority personnel with "final policymaking authority" approved of the warrantless cell phone searches.

## I.   BACKGROUND

### A.   Factual Background[1]

On August 22, 2014, the 113th class of the Port Authority Police Department ("PAPD") graduated from police academy training. (Pls.' Resp.,[2] ¶ 1.) On that day, all of the graduates became "Probationary Police Officers" ("PPOs") of the PAPD. (*Id.* ¶ 3.) The following day, some of these PPOs organized a post-graduation event at a beer garden in Jersey City, NJ. (Defs.' Resp.,[3] ¶ 35.) Following that event, approximately 95 PPOs and several academy instructors continued to an after-party at the Texas Arizona Bar & Grill in Hoboken, NJ (the "Texas Arizona"). (*Id.* ¶ 36.)

---

[1] Unless otherwise noted, all factual statements are not in dispute.

[2] "Pls.' Resp." refers to Plaintiffs' Response to Defendants' Local Rule 56.1 Statement, ECF No. 101.

[3] "Defs.' Resp." refers to The Port Authority Defendants' Response to Plaintiffs' Statement of Material Facts, ECF No. 103.

The Texas Arizona after-party was rowdy. There were reports that PPOs engaged in a wide range of misconduct, including damaging property, stealing beer, inappropriately touching a patron's breast and a barmaid's buttocks, fighting with and pulling a knife on a bouncer, and jumping turnstiles at the Hoboken PATH station. (Defs.' Resp., ¶¶ 56–59, 61, 70.) The bouncer at the Texas Arizona stated it was the "worst night" he had "ever worked." (Pls.' Resp., ¶ 13.) While the after-party was still ongoing, the general manager of the Texas Arizona called Sgt. Kevin Cottrell of the PAPD to report PPO misconduct. (Defs.' Resp., ¶ 38.) Following that call, Sgt. Cottrell came to the Texas Arizona and ordered the PPOs to leave. (Pls.' Resp., ¶ 12.) The PPOs openly defied his order. (*Id.*) At approximately 1:30 or 2:00 a.m., Sgt. Cottrell called Defendant Lieutenant Timothy McGovern and informed him about the events at the Texas Arizona. (Defs.' Resp., ¶¶ 39–40.) At the time, McGovern was the Executive Officer of the Port Authority's Police Integrity Unit ("PIU"), the unit responsible for police misconduct investigations. (Pls.' Resp., ¶ 7.)

On the morning of August 24, 2015, McGovern called Defendant Michael Nestor and told him about the call he had received from Sgt. Cottrell. (Defs.' Resp., ¶ 41.) At the time, Michael Nestor was the Acting Inspector General of the Port Authority. (*Id.* ¶ 11.) Nestor directed McGovern to open a PIU investigation into the events occurring at the Texas Arizona after-party (the "Texas Arizona Investigation"). (*Id.* ¶ 42.) On that same day, McGovern informed Defendants Michael Fedorko and Karen Connelly about this investigation. (*Id.* ¶ 43–44.) At the time, Fedorko was Superintendent and Connelly was the Assistant Director of the PIU. (*Id.* ¶ 6, 43.)

McGovern was responsible for structuring and carrying out the Texas Arizona Investigation. (*Id.* ¶ 46.) Defendant Lieutenant Steven Adelhelm—who is also a member of PIU—was McGovern's second-in-command and took direction from him on the investigation.

(Defs.' Resp. ¶ 47.) Approximately nine investigators worked under McGovern and Adelhelm. (*Id.* ¶ 48.) Throughout the investigation, McGovern was in "close lines of communication on a regular basis" with Defendants Connelly, Nestor, and Steven Pasichow. (*Id.* ¶ 83.) At the time, Pasichow was the Acting Director of Investigations at the Port Authority. (*Id.* ¶ 8.) Collectively, Defendants McGovern, Connelly, Pasichow, and Nestor were the "final decision maker[s]" on the manner in which PIU gathered evidence. (*Id.* ¶ 13.)

PIU investigators eventually interviewed all of the PPOs who were present at the Texas Arizona after-party. (*Id.* ¶ 52.) Before these interviews began, all the PPOs reported to the gymnasium at the Port Authority Tech Center. (*Id.* ¶ 107.) There, McGovern gave a presentation with the goal of "warn[ing]" the PPOs that "they were required to cooperate in an investigation." (*Id.* ¶ 113.) At least one PPO testified that McGovern verbally informed the PPOs that if they "in any way did not cooperate with the investigation," they "could face termination." (Ex. 21[4] (Preston Dep. Tr.), at 62:25–63:5.[5]) Because the PPOs were probationary employees, all of them could have, in fact, been fired for any non-arbitrary and non-discriminatory reason. (Defs.' Resp., ¶ 90.)

On September 18, 2014, the first day of PPO interviews, McGovern learned that certain PPOs who had attended the Texas Arizona after-party had used a cell phone application called GroupMe to communicate with other PPOs about the after-party. (Pls. Resp., ¶ 25; Defs.' Resp., ¶ 72.) GroupMe allows a group of individuals to participate in a private chat room that the entire group can view. (Defs.' Resp., ¶ 151.) After learning about these GroupMe messages, McGovern

---

[4] Numbered exhibits refer to exhibits attached to the Declaration of O. Andrew F. Wilson, dated January 20, 2016. (ECF No. 102.) Lettered exhibits refer to exhibits attached to the Declarations of Kathleen Gill Miller, dated December 12, 2016, and February 17, 2017. (ECF Nos. 97, 104.)

[5] Defendants do not explicitly admit this fact, but have not offered any evidence to rebut it. (*See* Defs.' Resp., ¶ 116.)

directed PIU investigators to ask PPOs whether they participated in GroupMe chats. (*Id.* ¶ 73.) Where the PPO had participated in such a chat, McGovern instructed the investigating officers to request to view those messages. (Pls.' Resp., ¶ 27; Ex. I (McGovern Dep. Tr., 231:3–13).) McGovern further instructed the officers to inform the PPOs that the search was "voluntary" and that they had the opportunity to first speak with a union representative. (*Id.*) He did not instruct them to obtain a warrant. (*See* Defs.' Resp., ¶ 87.)

Pursuant to McGovern's instructions, PIU investigators requested and reviewed the contents of thirty-six PPO cell phones. (Defs.' Resp., ¶ 88.) Many of the PPOs acceded to the cell phone search after being given the opportunity to speak with a union representative. (Pls.' Resp., ¶ 24.) But it is disputed whether *every* PPO was given the opportunity to speak with a representative. (Defs.' Resp., ¶ 128.) Interview transcripts reveal that during thirty-three of those interviews, PPOs were given the opportunity to speak with their union representative before acceding to the search.[6] It is unclear whether three of the PPOs—Kathleen Howard, Darryl Melvin, and Melissa Rubio—were given the opportunity to speak with a representative.[7] These

---

[6] *See* Ex. DD (Ahearn Tr.), at 7:8–15, 20:13–18; Ex. WW (Bader Tr.), at 6:19–7:7; Ex. EE (Barrera Tr.), at 7:25–9:21; Ex. II (Battisti Tr.), at 11:19–12:22; Ex. JJ (Bock Tr.), at 9:24–10:2; Ex. KK (Bordonaro Tr.), at 9:5–13, 12:7–11; Ex. XX (Correa Tr.), at 27:2–16; Ex. YY (Darias Tr.), at 13:15–25; Ex. ZZ (DeFalco Tr.), at 18:1–7; Ex. BB (Doscher Tr.), at 83:11–21; Ex. MM (Drum Tr.), at 22:10–23:2; Ex. NN (Estevez Tr.), at 9:3–9:7, 10:18–11:2; Ex. AAA (Francavilla Tr.), 13:3–23; Ex. BBB (Gambino Tr.), at 5:12–18; Ex. SSS (Huczko Tr.), at 8:8–21; Ex. RRR (Imparato Tr.), at 13:8–20; Ex. JJJ (Kennelly Tr.), at 32:7–25; Ex. DDD (Kuchie Tr.), at 33:10–34:2; Ex. U (Leeds Tr.), at 12:19–23; Ex. KKK (Lukenovich Tr.), at 19:18–25; Ex. EEE (Mannerino Tr.), at 6:24–7:5; Ex. OO (Marratta Tr.), at 8:10–14; Ex. FFF (Martinez Tr.), at 7:11–17; Ex. NNN (Miller-Rodriguez Tr.), at 11:16–12:18; Ex. FF (Mulvey Tr.), at 10:14–11:16; Ex. GGG (Novelli Tr.), at 6:16–7:15; Ex. HH (Oomen Tr.), at 30:16–31:16; Ex. QQQ (Paskoff Tr.), at 10:11–11:13, 38:4–16; Ex. OOO (Paskovich Tr.), at 13:12–19; Ex. HHH (Preston Tr.), at 16:10–16; Ex. PP (Riggio Tr.), at 7:3–20; Ex. PPP (Sheehan Tr.), at 9:2–10; Ex. SS (Small Tr.), at 37:20–38:11.

[7] According to Howard's deposition testimony, investigators asked her to unlock her phone and she did so. (Ex. 36, at 238:16–21.) There is no evidence in the record that before she assented to the search, investigators gave her the opportunity to speak with a union representative. The transcripts of Melvin's and Rubio's interviews do not indicate that they were given the opportunity to speak to a representative. (*See* Ex. MMM (Melvin Tr.); Ex. QQ (Rubio Tr.).)

three PPOs were not interviewed by the Defendants, but instead by other investigators.[8]

It is undisputed that all of the cell phones investigators reviewed were the personal property of the PPOs: The Port Authority did not own them, pay for them, or pay for the PPO's cellular service. (Defs.' Resp., ¶¶ 148–49.) It is also undisputed that at the start of each of these thirty-six interviews, the PPOs were again informed they had to "cooperate in this investigation." (*Id.*, ¶¶ 81, 120; *see, e.g.*, Ex. AA, at 1:20–23 ("[Y]ou are reminded that you must cooperate in this investigation and answer our questions both honestly and accurately.") The investigators did *not* inform the PPOs they had the right to refuse the cell phone search. (Defs.' Resp., ¶ 117.) Many of the PPOs understood from McGovern's presentation and the other investigators' instructions, that they would be fired if they did not accede to the cell phone searches:

- PPO Bordonaro testified that she felt her "job was in jeopardy" and was "very pressured to comply" (Ex. 24, at 65:20–66:14);

- PPO Howard testified that she had an "understanding that if they wanted to see my phone, if I don't comply, that I would be fired" (Ex. 36, 258:22–25);

- PPO Kennelly testified that she did not feel like the cell phone search was voluntary (Ex. 3, at 61:16–19);

- PPO Leeds testified that he "felt like [he] had no choice" but to allow the search (Ex. 27, at 84:4–13);

- PPO Mulvey testified that the cell phone search "didn't feel voluntary" and that he felt he "would be fired" if he did not cooperate (Ex. 26, at 40:3–7, 45:17–22);

- PPO Preston testified that because the PPOs were told they could be fired if "in any way [they] didn't cooperate with the investigation," he was under duress when he acceded to the cell phone search (Ex. 21, at 62:25–63:5); and

- PPO Small testified that he felt like his "job was on the line" if he did not in any way cooperate with the investigators, including by sending screenshots of chat messages (Ex. 25, at 62:19–63:11).

---

[8] PPO Howard was interviewed by Sgt. Scudese and Dt. Louis Martinez. (Ex. CCC (Howard Tr.), at 1.) PPO Melvin was interviewed by Sgt. Scudese and Sgt. Kennedy. (Ex. MMM (Melvin Tr.), at 1.) PPO Rubio was interviewed by Sgt. Chris Martinez and Dt. Louis Martinez. (Ex. QQ (Rubio Tr.), at 1.)

The last PPO cell phone search was conducted on October 10, 2014. (*See* Pls.' Resp., ¶ 101.) On October 20, 2014, PIU issued its final report on the investigation. (*Id.* ¶ 102.)

**B.      Relevant Procedural History**

Plaintiffs filed this action against Defendants on May 6, 2015, before the Honorable Alison J. Nathan. (*See* Compl., ECF No. 1.) On October 10, 2016, the Court partially granted Plaintiffs' motion for leave to amend its Complaint, permitting Plaintiffs to add Connelly, Pasichow, and Nestor as Defendants. (*See* Mem. & Order, ECF No. 88.) On October 21, 2016, Plaintiffs filed an Amended Complaint. (ECF No. 90.) The Amended Complaint alleges one cause of action for unreasonable search and seizure under 42 U.S.C. § 1983. (Am. Compl., ¶¶ 66–72.) Defendants filed their Answer on November 4, 2016. (ECF No. 94.) After discovery, Defendants moved for summary judgment on December 12, 2016. (ECF No. 95.) On August 31, 2017, the case was reassigned to the undersigned.

## II.      LEGAL STANDARD

**A.      Summary Judgment Standard**

Summary judgment is appropriate where the moving party shows there is no "genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether there is a "genuine" dispute as to material fact, "a court must construe the evidence in the light most favorable to the nonmoving party, drawing all inferences in that party's favor." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Niagara Mohawk Power Corp. v. Jones Chem., Inc.*, 315 F.3d 171, 175 (2d Cir. 2003)). The burden of showing that "no [dispute as to any] material fact exists lies with the party seeking summary judgment." *Id.* (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

To demonstrate the existence of a genuine issue of material fact, "[t]he opposing party must come forward with affidavits, depositions, or other sworn evidence as permitted by Fed. R.

Civ. P. 56, setting forth specific facts showing there exists a genuine issue of material fact." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The nonmoving party successfully demonstrates a genuine issue of material fact if the record is such that "a reasonable jury could return a verdict for the nonmoving party." *Fincher v. Depository Tr. & Clearing Corp.*, 604 F.3d 712, 720 (2d Cir. 2010) (quoting *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d Cir. 2008)) (internal quotation marks omitted).

### B.    § 1983 Standard

To prevail on a claim under 42 U.S.C. § 1983, plaintiffs must show that each defendant (i) "acted under color of state law" and (ii) deprived them "of a right secured by the Constitution or laws of the United States." *Palmieri v. Lynch*, 392 F.3d 73, 78 (2d Cir. 2004). Plaintiffs must also show that each defendant was "personally involved—that is, he directly participated—in the alleged constitutional deprivations." *Gronowski v. Spencer*, 424 F.3d 285, 293 (2d Cir. 2005). To show direct participation, the plaintiffs must show the defendants' "intentional participation in the conduct constituting a violation of the victim's rights by one who knew of the facts rendering it illegal." *Id.* (quoting *Provost v. City of Newburgh*, 262 F.3d 146, 155 (2d Cir. 2001)). With respect to a supervisory official, a plaintiff adequately alleges personal involvement where the official "created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue." *Williams v. Smith*, 781 F.2d 319, 323 (2d Cir. 1986).

### III.    DISCUSSION

### A.    § 1983 Liability

In *Riley v. California*, the Supreme Court held that a warrant is generally required before law enforcement officers may search a cell phone. 134 S. Ct. 2473, 2493 (2014). "[E]ven when a cell phone is seized incident to arrest," a valid search warrant is generally still required. *Id.* Absent "exigent circumstances" or similar "case-specific exceptions," law enforcement officers

are not permitted to search an individual's cell phone without a warrant. *Id.* at 2494.[9]

It is undisputed that Defendants McGovern and Adelhelm directed approximately nine investigators to conduct warrantless searches of PPO cell phones. (Defs.' Resp., ¶¶ 48, 87.) They also personally searched many PPO cell phones without first obtaining warrants. (*See, e.g.*, Ex. AA, at 1.) Defendants Connelly, Pasichow, and Nestor, all had "close lines of communications on a regular basis" with McGovern about these searches. (Defs.' Resp., ¶ 83.) A reasonable jury could therefore find that Defendants Adelhelm, Connelly, McGovern, Nestor, and Pasichow all either "directly participated" in warrantless searches of PPO cell phones, "created" the warrantless cell phone search procedures that others followed, or "allowed" these warrantless cell phone searches to continue.[10] *See Gronowski*, 424 F.3d at 293; *Williams v. Smith*, 781 F.2d at 323. Thus, absent a "case-specific" exception, a reasonable jury could find that these Defendants were all personally involved in violating the PPOs' Fourth Amendment rights. *See Riley*, 134 S. Ct. 2493–94.

Defendants claim that two exceptions preclude liability in this case: the "work-related" investigation exception and the consent exception. Those exceptions will now be considered.

1.  "Work-Related" Investigation Exception

    a)  Legal Standard

In the context of "work-related" investigations, the Supreme Court has permitted warrantless searches of areas that would normally require a warrant. *O'Connor v. Ortega*, 480 U.S. 709, 725–26 (1987). Under the "reasonableness" standard adopted in *O'Connor*, a

---

[9] Defendants claim that *Riley* is inapposite because the PPOs were not "under arrest." (Defs.' Memo, ECF No. 8, at 12; Defs.' Reply, ECF No. 105, at 1.) Defendants are wrong: *Riley* applies to all searches by law enforcement officers, absent a "case-specific" exception. *See Riley*, 134 S. Ct. 2493–24.

[10] The record is not clear on whether Defendant Fedorko was personally involved in directing or approving the cell phone searches. Deciding this issue is not necessary in light of the Court's ruling below on qualified immunity.

warrantless search is permitted if it is both "justified at its inception" and reasonable in "scope." *Id.* at 726 (quotation marks omitted). This exception, however, applies solely to searches conducted in the "workplace context," meaning searches of "those areas and items that are related to work and are generally within the employer's control." *Id.* at 715. The "workplace context" may include "hallways, cafeteria, offices, desks, and file cabinets." *Id.* at 716. But "[n]ot everything that passes through the confines of the business address can be considered part of the workplace context." *Id.* For example, the contents of a closed "handbag or briefcase" that merely "happens to be" at the worksite is not part of the "workplace context." *Id.*

b)  Application

The fact that Defendants were engaging in a purportedly "work-related" investigation did not permit them to conduct warrantless searches of items outside of the "workplace context." It is undisputed that the cell phones at issue here were purely personal. They were not the property of or paid for by the Port Authority. (Defs.' Resp., ¶¶ 148–49.) Like the closed "handbag or briefcase" described in *O'Connor*, PPOs had a strong expectation of privacy in these personal devices. *See* 480 U.S. at 724. Indeed, as the Supreme Court noted in *Riley*, the privacy interest in a person's cell phone is similar to, if not greater than, the privacy interest in one's home. 134 S. Ct. at 2491 ("[A] cell phone search would typically expose to the government far *more* than the most exhaustive search of a house . . . .") (emphasis in original). For this reason, just as courts have held that searches of locked personal safes, medical records, and an employee's home generally qualify as outside of the "workplace context," so too do searches of a personal cell phone. *See James v. Hampton*, 592 F. App'x 449, 457 (6th Cir. 2015) (holding *O'Connor* exception does not apply to search of personal safe kept in employee's office, where the employee "purchased the safe herself, kept it locked, and used it to store personal items"); *Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 675–76 (S.D.N.Y.

2009) (Chin, J.) (*O'Connor* exception does not apply to search of employee medical records in possession of health care provider); *Sabin v. Miller*, 423 F. Supp. 2d 943, 950–51 (S.D. Iowa 2006) (*O'Connor* exception does not apply to search of employee's home). The *O'Connor* exception therefore does not apply here.

In support of their motion, Defendants have cited no decisions applying *O'Connor* to personally-owned cell phones or to similar objects. (*See* Defs.' Mem. Law, ECF No. 98, at 7–9 (citing *City of Ontario v. Quon*, 560 U.S. 746, 750, 760–61 (2010) (applying *O'Connor* to searches of pagers that were *owned and issued* by the employer) and *Leventhal v. Knapek*, 266 F.3d 64, 66 (2d Cir. 2001) (applying *O'Connor* to searches of employee's *office* computer).) In conducting its own research, however, the Court has found decisions where *O'Connor* was held to justify searches of certain personal objects and places, including closed backpacks and even an individual's home as part of "sick check." *See United States v. Gonzalez*, 300 F.3d 1048, 1054 (9th Cir. 2002); *Stouch v. Twp. of Irvington*, No. 03-cv-6048 (JAG), 2008 WL 2783338, at *20 (D.N.J. July 16, 2008), *aff'd*, 354 F. App'x 660 (3d Cir. 2009). *Gonzalez* and *Stouch* are distinguishable from the present case because the searches there were made pursuant to an established policy that served a legitimate work-related purpose. In *Gonzalez*, the plaintiff was searched in a government store that had a policy of randomly searching employee's backpacks. *Gonzalez*, 300 F.3d at 1051. Because the employee there "had clear notice" of the policy and because the search served the legitimate purpose of deterring theft and recovering stolen objects, the Ninth Circuit held that the search did not violate the Fourth Amendment. *Id.* at 1054–55. In *Stouch*, defendants had a policy of performing "sick checks" at the homes of employees on sick leave. 2008 WL 2783338, at *20. Employees were on notice of this policy, which was in place to ensure that employees taking sick leave were, in fact, sick. *Id.* For that reason, the court found that searches pursuant to this policy were reasonable. *Id.* In the present case, by contrast, the Port

11

Authority had no policy allowing it to search personal cell phones, nor has it offered any explanation for why such a policy would be appropriate. The reasoning in those cases does not apply to the searches conducted here.

Because Defendants' warrantless cell phone searches are not protected as "work-related," Defendants' motion for summary judgment on that ground is DENIED.

### 2. Consent

#### a) Legal Standard

"[O]ne of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973). Consent must be a "product of . . . free and unconstrained choice," rather than a "mere acquiescence in a show of authority." *Anobile v. Pelligrino*, 303 F.3d 107, 124 (2d Cir. 2002) (quoting *United States v. Garcia*, 56 F.3d 418, 422 (2d Cir. 1993)). To be valid, consent must "not be coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth*, 412 U.S. at 228. "[C]oercion may be found where one is given a choice between one's employment and one's constitutional rights." *Anobile*, 303 F.3d at 124. Whether consent exists is a question of fact that requires "a careful scrutiny of the totality of the circumstances." *Sec. & Law Enf't Emps. v. Carey*, 737 F.2d 187, 202 n.23 (2d Cir. 1984). "Most importantly," the court must consider whether "the person had knowledge of the right to refuse to give consent." *Id.*

#### b) Application

Interpreting the facts in the light most favorable to Plaintiffs, and drawing all inferences in favor of Plaintiffs, a reasonable jury could find that the PPOs' acquiescence was coerced. Before being interviewed, all of the PPOs were told that if they did not cooperate with the investigation, they could be fired. (Ex. 21 (Preston Dep. Tr.), at 62:25–63:5.) Before permitting

PIU investigators to search their cell phones, PPOs were told a second time that they were required to cooperate. (Defs.' Resp., ¶ 120.) Many PPOs understood these instructions to mean they could be fired if they did not accede to a search of their cell phones.[11] The PIU investigators never corrected that understanding by informing the PPOs that they had the right to refuse the cell phone searches. (Defs.' Resp., ¶ 117.) Under these circumstances, a reasonable jury could find that the PPOs were "required" to accede to the cell phone searches, making their "consent" a "mere acquiescence in a show of authority." *See Anobile*, 303 F.3d at 124; *Phillips v. Cty. of Orange*, 894 F. Supp. 2d 345, 372 (S.D.N.Y. 2012) (Karas, J.) (denying motion to dismiss because plaintiffs alleged defendants told them they were "required" to comply). A reasonable jury could also find that the PPOs were given the choice between losing their jobs and "consenting" to the cell phone search, vitiating that consent. *See Anobile*, 303 F.3d at 124–25 (holding that consent to search was not effective because consent was "required for employment").

Because a reasonable jury could find that the PPOs did not consent to these searches, a warrant was required before initiating the searches. Defendants' motion for summary judgment based on consent is therefore DENIED.

**B.    *Monell* Liability: Defendant Port Authority**

1.    Legal Standard

To establish municipal liability under § 1983, plaintiffs must show that that their deprivation was caused by a "policy or custom." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). A single unconstitutional act by an official with "final policymaking authority" can

---

[11] Ex. 24 (Bordonaro Dep. Tr.), at 65:20–66:14; Ex. 36 (Howard Dep. Tr.), 258:22–25; Ex. 3 (Kennelly Dep. Tr.), at 61:16–19; Ex. 27 (Leeds Dep. Tr.), at 84:4–13; Ex. 26 (Mulvey Dep. Tr.), at 40:3–7, 45:17–22; Ex. 21 (Preston Dep. Tr.), at 62:25–63:5; Ex. 25 (Small Dep. Tr.), at 62:19–63:11.

qualify as a "policy." *Pembaur v. City of Cincinatti*, 475 U.S. 469, 481 (1986); *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 126 (2d Cir. 2004) ("[A] single action by a decisionmaker who possesses final authority to establish municipal policy with respect to the action ordered is sufficient to implicate the municipality in the constitutional deprivation for the purposes of § 1983.") (citations and internal quotation marks omitted). An official has "final policymaking authority" when his or her "decisions, at the time they are made, for practical or legal reasons constitute the municipality's final decisions." *Rookard v. Health & Hosps. Corp.*, 710 F.2d 41, 45 (2d Cir. 1983).

      2.    <u>Application</u>

Defendants claim, incorrectly, that there is "no support" for Plaintiffs' claim that Port Authority policymakers approved of the cell phone searches at issue here. (Defs.' Mem. Law, at 19.) In fact, as Judge Nathan noted in her October 17, 2017 Order, there is a strong factual basis to conclude that Defendants Connelly, Pasichow, and Nestor had decision-making authority over PIU investigation methods and approved of the warrantless cell phone searches at issue here. (*See* Mem. & Order, ECF No. 88, at 11–12.) Defendants acknowledged in an interrogatory response, and again in their Rule 56.1 Response, that these individuals—along with McGovern—were "the final decision maker[s] on the manner in which PIU gathered evidence." (Defs.' Resp., ¶ 13; Ex. 43.). These four Defendants, therefore, collectively appear to have had "final authority" over the investigatory methods used during the Texas Arizona Investigation, including the cell phone searches at issue here. *See Rookard*, 710 F.2d at 45 (holding officials had "authority to make policy" where evidence showed that their authority over the actions they took was "final"); *Vasquez v. New York City Dep't of Educ.*, No. 11-CV-3674, 2015 WL 3619432, at *11-12 (S.D.N.Y. June 10, 2015) (Nathan, J.) (denying municipality's Rule 50 motion with respect to *Monell* liability, where official testified that he was the "the final decision

maker"), *aff'd*, 667 F. App'x 326 (2d Cir. 2016).

As discussed above, it is undisputed that Defendants McGovern, Connelly, Pasichow, and Nestor all had "close lines of communications on a regular basis" with each other about the warrantless cell phone searches that McGovern directed. (Defs.' Resp., ¶¶ 48, 83, 87.) It appears, then, that Port Authority personnel with "final policymaking authority" acted on and approved the unconstitutional cell phone searches at issue here. If Defendants wish to contest this point, they shall file a motion for reconsideration by October 16, 2017.

### C. Qualified Immunity: Defendants Adelhelm, Connelly, Fedorko, McGovern, Nestor, and Pasichow

#### 1. <u>Legal Standard</u>

Even where a government official has violated a constitutional right, he or she is "entitled to qualified immunity if the right he violated was not 'clearly established' at the time of the events at issue." *Winfield v. Trottier*, 710 F.3d 49, 56 (2d Cir. 2013) (internal quotation marks omitted) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Fabrikant v. French*, 691 F.3d 193, 212 (2d Cir. 2012) (quoting *Reichle v. Howards*, 132 S.Ct. 2088, 2093 (2012)). An official who makes "reasonable mistakes," including "a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact" is entitled to qualified immunity. *Sudler v. City of New York*, 689 F.3d 159, 174 (2d Cir. 2012) (citations and internal quotation marks omitted). Indeed, the doctrine protects "all but the plainly incompetent or those who knowingly violate the law." *Id.* (quoting *Walcyk v. Rio*, 496 F.3d 139, 154 (2d Cir. 2007)); *accord Moore v. Andreno*, 505 F.3d 203, 214 (2d Cir. 2007) ("Normally, it is only . . . those who are not worthy of the mantle of office . . . who are precluded from claiming the protection of qualified immunity." (quoting *Malley v. Briggs*, 475 U.S. 335,

341 (1986)).).

"To determine whether a right is clearly established, we look to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). In determining the "the level of generality at which the relevant 'legal rule' is to be identified," courts must ensure that the right is "defined in a more particularized, and hence more relevant, sense." *Winfield*, 710 F.3d at 56–57 (citations and internal quotation marks omitted).

### 2. Application

The record shows that in thirty-three of the thirty-six searches conducted by Defendants or investigators acting under them, PPOs were given the opportunity to speak with a union representative before acceding to a cell phone search.[12] Although that opportunity was not provided in three PPO searches,[13] those searches were not conducted by Defendants.[14] There is no evidence in the record suggesting that Defendants knew that these three searches were conducted without first giving the PPO the opportunity to speak with a union representative. To the contrary, the record indicates that McGovern specifically instructed the investigators to inform PPOs that they could first speak to a union representative. (*See* Pls.' Resp., ¶ 27; Ex. I (McGovern Dep. Tr., 231:3–13).) Although PPOs were generally directed to comply with the investigation, there is also no evidence that Defendants told PPOs they would be fired if they did not accede to a cell phone search, in particular.

---

[12] *See supra* note 6.

[13] *See supra* note 7.

[14] *See supra* note 8.

The issue here is therefore whether it was clearly established in 2014 that it is a Fourth Amendment violation for an investigating police officer to search (or direct a subordinate to search) the cell phone of another employee of the police department, where the employee was previously informed that she could be fired for not complying with the investigation, but where the employee was not specifically told she would be fired for not consenting to the cell phone search and, before acceding, was given the opportunity to speak with a union representative. No Supreme Court or Second Circuit decision has found a lack of consent in these circumstances. The closest Second Circuit decision is *Anobile*, which held that plaintiffs there did not effectively consent to a search by submitting a licensing application that was required for their employment. 303 F.3d at 123. The court noted that "coercion may be found where one is given a choice between one's employment and one's constitutional rights." *Id.*

Even drawing all facts and inferences in favor of Plaintiffs, it would have been reasonable for Defendants not to have understood that the PPOs were being "given a choice between [their] employment and [their] constitutional rights." *See id.* Although a reasonable officer would have understood that the PPOs were being forced to comply with the investigation *generally*, a reasonable officer may not have understood that the PPOs were being coerced to accede to the cell phone search specifically. Indeed, by giving the PPOs the opportunity to speak to a union representative before acceding to the cell phone search, a reasonable officer could have concluded that their consent was valid. Even though it is a question of fact whether the PPOs were coerced to accede to these searches, it was not "plainly incompetent" for the Defendants to have believed that they had valid consent; an officer "worthy of the mantle of the office" could have made a reasonable mistake of fact about whether the PPOs consented.

The limited guidance from the Supreme Court and Second Circuit in this area of law further supports a finding of qualified immunity. Courts in other jurisdictions, as well, have

recognized the "blurriness" in this area and held that qualified immunity applies where the official did not clearly and directly threaten termination of employment. *See Clemente v. Vaslo*, 679 F.3d 482, 493 (6th Cir. 2012) (holding that under clearly established law, direct order did not coerce consent, because "[s]hort of threatening termination, what public employers could do to obtain an employee's consent to conduct an inspection was not clearly established"); *accord Delia v. City of Rialto*, 621 F.3d 1069, 1079 (9th Cir. 2010), *as amended on denial of reh'g* (Nov. 8, 2010) (holding that clearly established law did not put defendants on notice that a direct order "with no attendant threat to . . . employment" would invalidate consent), *rev'd on other grounds sub nom. Filarsky v. Delia*, 566 U.S. 377 (2012)).

In their opposition brief, Plaintiffs cite to one decision in which where a court denied qualified immunity in the context of a cell phone search, *Larios v. Lunardi*, No. 215-CV-02451 (MCE) (CMK), 2016 WL 6679874 (E.D. Cal. Nov. 14, 2016). (*See* Pls.' Opp'n, ECF No. 100, at 24–25.) In that case, however, the defendant provided plaintiff with a memo specifically directing that his "phone had to be turned over" and warning that he "would be subject to 'charges/disciplinary action' if he failed to cooperate." *Id.* at *2. Here, by contrast, Defendants did not specifically threaten to fire PPOs if they did not accede to a search of their phones and also engaged in conduct that made it reasonable for them to believe they had obtained valid consent.

Because Defendants Adelhelm, Connelly, Fedorko, McGovern, Nestor, and Pasichow did not violate a clearly established constitutional right, their actions are entitled to qualified immunity. Defendants' motion for summary judgment is GRANTED with respect to monetary

damage claims[15] against those Defendants in both their individual and official capacities.[16]

**D.     Equitable Relief**

1.     Legal Standard

"[A] plaintiff must demonstrate standing for each claim and form of relief sought." *Baur v. Veneman*, 352 F.3d 625, 641 n.15 (2d Cir. 2003). To establish standing to seek prospective relief—whether for a declaratory judgment or injunction—"a plaintiff must demonstrate a 'certainly impending' future injury." *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). "Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974). Proving the existence of an official policy is not sufficient to establish standing to seek equitable relief: A plaintiff must "demonstrate *both* a likelihood of future harm and the existence of an official policy or its equivalent." *Shain v. Ellison*, 356 F.3d 211, 216 (2d Cir. 2004) (emphasis in original).

2.     Application

Plaintiffs have not met their burden of establishing standing for equitable relief. The Texas Arizona Investigation is over. (*See* Pls.' Resp., ¶ 102.) There is no evidence that the Port

---

[15] "Qualified immunity shields the defendants only from claims for monetary damages and does not bar actions for declaratory or injunctive relief." *Adler v. Pataki*, 185 F.3d 35, 48 (2d Cir. 1999). But as discussed below, Plaintiffs' claims for equitable relief against these Defendants are dismissed on a different basis.

[16] Because Defendants Adelhelm, Connelly, Fedorko, McGovern, Nestor, and Pasichow have qualified immunity, claims against them in their individual capacities are dismissed. *Frank v. Relin*, 1 F.3d 1317, 1327 (2d Cir. 1993) ("[A] defense of qualified immunity may properly be raised only with respect to claims asserted against a defendant in his individual capacity. Qualified immunity is not a defense to a claim against a municipal official in his official capacity."). Claims against these individuals in their official capacities are dismissed as duplicative because the Port Authority is a defendant here. *See, e.g.*, *Phillips*, 894 F. Supp. 2d, at 384 n.35 (S.D.N.Y. 2012) ("[I]n the Second Circuit, where a plaintiff names both the municipal entity and an official in his or her official capacity, district courts have consistently dismissed the official capacity claims as redundant.").

Authority has searched PPO cell phones during any other investigation or that it is planning to do so in the future. Plaintiffs claim that future injury is likely because the Port Authority's cell phone search policy is "widespread" and has been "enforced repeatedly." (Pls.' Opp'n, at 23–24.) Although Plaintiffs have pointed to multiple instances in which Port Authority investigator's searched PPO cell phones, all of those searches were part of the *same* investigation—the Texas Arizona Investigation—overseen by the *same* investigating officer—McGovern. A similar argument for standing was rejected in *Stauber v. City of New York*, No. 3-CV-9162 (RWS), 2004 WL 1593870, at *17 (S.D.N.Y. July 16, 2004), as amended (July 19, 2004), as amended 2004 WL 1663600 (S.D.N.Y. July 27, 2004) (Sweet, J.). In that case, plaintiffs sought injunctive relief barring the NYPD from deploying the Mounted Unit during future protests. *Id.* at *16. Although plaintiffs alleged that their constitutional rights had been repeatedly violated following the deployment of the NYPD Mounted Unit, all of the violations occurred during a single deployment that occurred during a single protest. *Id.* Because all of the alleged violations occurred during the same event, the court rejected plaintiffs' claim that the violations were "likely" to be repeated. *Id.* Under the similar circumstances here, Plaintiffs have not demonstrated a sufficient "likelihood of future harm."

Plaintiffs also argue that because the cell phone search is now a "Port Authority policy," it is likely that future investigations will "include a similar illegal cell phone search." (Pls.' Opp'n, at 23.) But the "existence of an official policy, on its own" is not "sufficient to confer standing." *Shain*, 356 F.3d at 216. Plaintiffs must also show a likelihood of future harm. *Id.* In *Stauber*, for example, the NYPD had written guidelines for deploying the Mounted Unit. 2004 WL 1593870, at *12. Nevertheless, because that unit had been deployed on only one occasion, plaintiffs failed to show that future injury was likely. *Id.* at *16. Plaintiffs' claim here is no different.

The decisions Plaintiffs rely upon are distinguishable for the same reasons. *See Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340 (2d Cir. 1998); *Ligon v. City of New York*, 288 F.R.D. 72, 76, 81 (S.D.N.Y. 2013) (Scheindlin, J.) (holding that standing existed to challenge widespread, *ongoing* practice of "unlawful trespass stops outside buildings in the Bronx"); *Franklin v. City of Chicago*, 102 F.R.D. 944, 946, 948 (N.D. Ill. 1984) (holding that standing existed to challenge policy of using all-metal interior squadrol vehicles to transport arrestees, where complaint alleged defendant frequently arrested innocent civilians and where policy *required* the use of squadrols during *all* arrests). For example, in *Deshawn E.*, the Second Circuit held that plaintiffs had standing to challenge the NYPD Family Court Detective Squad's alleged practice of coercively interrogating children facing delinquency charges. 156 F.3d at 342. In holding that plaintiffs had standing, the court noted both that the Detective Squad's practices were allegedly authorized by a written memorandum *and* that the NYPD planned to institute these squads in multiple buildings in New York City. *Id.* at 345; *see also Shain*, 356 F.3d at 216 (rejecting claims of standing and clarifying that *Deshawn E.* did not hold that the existence of an official policy is, by itself, sufficient for standing). Here, by contrast, there is no evidence that Port Authority has plans to use warrantless cell phone searches in the future.

Because Plaintiffs have not shown a likelihood of future injury, they lack standing to seek equitable relief. Defendants' motion for summary judgment with respect to dismissing Plaintiffs' claims for equitable relief is therefore GRANTED.

## IV.    CONCLUSION

In conclusion, (1) Defendants' searches were not protected as properly part of a "work-related" investigation, (2) a reasonable jury could find that Plaintiff Howard and Plaintiff PAPBA's members did not consent to Defendants' searches, (3) in the event that a jury makes those findings, it appears that Defendant Port Authority is liable for violating the Fourth

Amendment rights of Plaintiff Howard and Plaintiff PABPA's members because it appears that Port Authority personnel with "final policymaking authority" approved of the warrantless cell phone searches here, (4) Defendants Adelhelm, Connelly, Fedorko, McGovern, Nestor, and Pasichow are entitled to qualified immunity because no reasonable jury could find that they violated a clearly established constitutional right, and (5) because Plaintiffs have not shown a likelihood of future harm, they lack standing to sue for equitable relief.

For these reasons, the Court (1) GRANTS summary judgment in favor of all Defendants with respect to Plaintiffs' claims for equitable relief; (2) GRANTS summary judgment in favor of Defendants Adelhelm, Connelly, Fedorko, McGovern, and Pasichow, with respect to Plaintiffs' claims for equitable and monetary relief; and (3) DENIES summary judgment with respect to Plaintiffs' claims for monetary relief against Defendant Port Authority.

The Clerk of Court is directed to terminate the motion at ECF No. 95 and to terminate Defendants Adelhelm, Connelly, Fedorko, McGovern, and Pasichow.

The remaining parties shall, by October 20, 2017, submit to the Court a joint letter outlining steps that need to be taken before the case is Ready for Trial. The parties must file a joint pretrial order by November 3, 2017. By that date, the parties shall also advise the Court whether they consent to trial of this case before a Magistrate Judge. The case will be deemed Ready for Trial on November 10, 2017. Counsel are directed to comply with this Court's Individual Rules.

SO ORDERED.

Dated: New York, NY
      September 29, 2017

_Kimba M. Wood_

—————————————————
KIMBA M. WOOD
United States District Judge